**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3216-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL KAPROSCH,

     Defendant-Appellant.

_____

Argued January 28, 2020 – Decided March 6, 2020

Before Judges Yannotti, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Sussex County, Indictment Nos. 17-02-0068 and 17-03-0090.

Cody Tyler Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody Tyler Mason, of counsel and on the brief).

Shaina Brenner, Assistant Prosecutor, argued the cause for respondent (Francis A. Koch, Sussex County Prosecutor, attorney; Shaina Brenner, of counsel and on the brief).

PER CURIAM

Defendant was tried before a jury and found guilty of burglary and other offenses. Thereafter, defendant pled guilty to charges under a separate indictment, and the trial court sentenced defendant to an aggregate ten-year term of incarceration. Defendant appeals from judgments of conviction (JOC) dated February 20, 2018. For the reasons that follow, we affirm defendant's convictions, but remand the matter to the trial court for resentencing on Indictment No. 17-02-0068 and entry of a corrected JOC on Indictment No. 17-03-0090.

I.

On February 16, 2017, a Sussex County grand jury returned Indictment No. 17-02-0068, charging defendant with third-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count one); third-degree theft by unlawful taking of movable property having a value of more than $500 but less than $75,000, N.J.S.A. 2C:20-3(a) (count two); and third-degree criminal mischief by damaging property and causing a pecuniary loss of more than $2000, N.J.S.A. 2C:17-3(a)(1) (count three).

On March 2, 2017, a grand jury in Sussex County returned Indictment No. 17-03-0090, charging defendant with third-degree aggravated assault, N.J.S.A.

2C:12-1(b)(2) (count one); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d) (count two); and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count three).

In October 2017, defendant was tried before a jury on the charges in Indictment No. 17-02-0068. At trial, Nicholas DellaFave testified that on August 10, 2016, he was at the National Guard Armory in Newton to collect soil and groundwater samples as part of an environmental investigation. At the end of the day, DellaFave noticed a man in the woods on the property. He called the police.

Officer Joseph D'Annibale of the Newton Police Department (NPD) responded to the scene. He entered the woods and saw defendant, whom he knew by name from "prior dealings" with him through work. D'Annibale told defendant he was not allowed on the property. Defendant gathered his belongings and left.

Later, after D'Annibale departed, DellaFave noticed the door to the armory's boiler room was not secured. He entered the boiler room and saw that "pipes had been cut and removed off the boiler, and [pipe] insulation [was] lying all over the floor." He again called the police.

D'Annibale returned to the armory and entered the boiler room. He observed that pipes and radiators were missing from a room in the armory. He saw debris on the floor, including beer cans, cigarettes, cigarette packages, and garbage. D'Annibale also observed a shoe or boot print on the floor. He concluded that the armory had been burglarized, and he reported the incident to his detective sergeant at the NPD.

Detective Steven Van Nieuwland of the NPD was told about the burglary. On August 16, 2016, Van Nieuwland and another detective went to the armory to determine how the intruder may have entered the building. The detectives discovered a "possible point of entry," specifically unlocked double doors facing a wooded area. Van Nieuwland took photographs of the scene.

According to Van Nieuwland, the photographs accurately depicted what he observed when he took the photos. They showed "asbestos insulation laying on the floor from [the] recovered copper piping"; "brackets on the wall with the radiators missing"; a pack of "Eagle 20 cigarettes"; and "boot prints that [were] almost like a trail . . ." He stated that "obviously, somebody was walking in the same path from the main part of the building through the day and out the door."

Van Nieuwland said that after he took the photos, he and D'Annibale went to George's Salvage Company (GSC), which is located directly across the street

4

from the armory, to ask if anyone had brought in copper pipes recently. At GSC, Van Nieuwland obtained documents, which indicated that defendant sold copper and brass to the salvage yard on seventeen dates between July 13, 2016 and August 16, 2016.

After Van Nieuwland obtained the documents from GSC, he began looking for defendant. He located him behind a baseball field in a park adjacent to the salvage yard and the armory. He asked defendant to accompany him to the police station for questioning.

Van Nieuwland testified that defendant had in his possession "a pair of work boots that were consistent with the boot prints that were found in the armory." According to Van Nieuwland, defendant also was in possession of a pack of Eagle 20 cigarettes. Van Nieuwland arrested defendant.

Thomas Barry was employed by GSC as an operations manager during the summer of 2016. He testified that GSC has two scales, which are used to weigh materials brought in for sale. He noted that there was a camera at the door, where GSC paid for the materials. Barry said a photo identification (ID), such as a driver's license, is required for certain purchases. Barry explained that GSC has a computer system that is used to check the IDs. The computer prints out receipts and maintains copies of the IDs.

A-3216-17T4

Barry said defendant was at GSC in July and August 2016. Based on company records, Barry stated that defendant's first transaction at GSC took place on July 13, 2016. The prosecutor presented Barry a receipt and a photograph for that transaction. He testified that the picture shows defendant at the front desk and the receipt indicates GSC paid defendant $80.50 for copper tubing and brass.

The prosecutor then presented Barry with a receipt and a photograph pertaining to a transaction on July 15, 2016. The photo shows defendant at the window. The receipt indicates that GSC paid defendant $70 for copper tubing and a brass-copper mix. Barry testified that the company's records show that on July 18, 2016, GSC paid defendant $90.15 for copper aluminum fins, brass, and copper.

Another receipt indicates that on July 19, 2016, GSC paid defendant $119.40 for copper, brass, and copper-aluminum fins. According to Barry, the metal fins are typically used in "very large radiators" for heating. Barry testified that the company's transaction logs indicate that defendant sold materials to GSC seventeen separate times between July and August 2016, and GSC paid defendant a total of $1489.15. These materials included copper, brass valves, brass elbows, copper aluminum fins, stainless steel, and mixed brass and copper.

Barry also testified that when the burglaries took place, GSC had surveillance cameras. Video footage from the surveillance cameras was played for the jury. Barry testified that the footage depicts defendant coming from the woods in the direction of the armory on the dates of the aforementioned transactions, with bags or boxes of metals. Barry stated that the footage also depicts defendant with copper-aluminum fins.

William Charles McBride testified that he was responsible for maintenance at the armory as part of his job with the Department of Military and Veteran Affairs (Department). McBride said that between July and August 2016, he was employed as the Department's asbestos program manager. He stated that the armory was constructed during the so-called Cold War era.

McBride explained that the Department built such structures using identical floor plans and standards. He said the buildings are heated from a central boiler room, with pipes running through the building and fin-tube radiators on exterior walls. McBride was shown photos of the materials defendant sold to GSC. He said the materials shown in the photos are radiators or other metals of the type found in the armory. He could not tell, however, whether the copper pipes shown in the photos were like those in the armory.

McBride added that on August 10, 2016, he was informed that someone had broken into the armory. Several days later, McBride installed cameras on the premises to catch the intruder. On August 22, 2016, he retrieved the cameras.

The prosecutor presented McBride with a copy of photos from the cameras. McBride said some of the photos show an individual in the armory at around 1:00 a.m., on August 16, 2016. He noted that the photos also show asbestos debris. He estimated that the cost to clean up the debris would be "greater than $2000."

Van Nieuwland further testified that the photographs from McBride's cameras show defendant carrying metal at the armory early in the morning of August 16, 2016. He said the man in the photos was carrying pipes, which were consistent with the materials defendant sold to GSC.

After the State rested its case, defendant moved for a judgment of acquittal. The judge denied the motion. Defendant decided not to testify and he did not call any witnesses. The jury found defendant guilty on the three counts of Indictment No. 17-02-0068. Thereafter, defendant pled guilty to the charges in Indictment No. 17-03-0090. On February 9, 2018, the judge

sentenced defendant on both indictments, and imposed an aggregate ten-year term of incarceration. This appeal followed.

On appeal, defendant raises the following arguments:

POINT I
THE STATE'S CASE WAS UNFAIRLY BOLSTERED BY: OPINION TESTIMONY IDENTIFYING DEFENDANT IN PHOTOS AND VIDEOS. (Not Raised Below); OPINION TESTIMONY COMPARING DEFENDANT'S BOOTS TO SHOE PRINTS AT THE ARMORY; THE PROSECUTOR'S OPINION ABOUT THE POPULARITY OF CIGARETTES FOUND IN THE ARMORY (Not Raised Below); AND QUASI-EXPERT TESTIMONY ABOUT ITEMS DEFENDANT SOLD. (Partially Raised [Below]).

A. The Trial Court Committed Plain Error in Allowing Witnesses to Identify Defendant in Photos and Videos That Were Available to the Jury.

B. The Trial Court Wrongly Allowed A Detective to Testify, Based on Photos Available to the Jury, That Defendant's Boots Were Consistent with the Shoeprints in the Armory.

C. The Prosecutor Committed Misconduct When, Without Support in the Records, He Opined That the Cigarettes Found in the Armory and On Defendant Were Unusual.

D. The Trial Court Improperly Allowed Lay Witnesses to Offer Expert Testimony About Whether the Items Sold by Defendant Could Have Come from The Armory.

A-3216-17T4

POINT II
THE TRIAL WAS TAINTED BY THE PROSECUTOR'S REFERENCE TO DEFENDANT BEING "ADDICTED" TO EASY MONEY (Not Raised Below), THE OFFICERS' TESTIMONY THAT THEY KNEW DEFENDANT THROUGH WORK, AND THE PROSECUTOR'S COMPARISON OF DEFENDANT TO ADOLF HITLER.  (Partially Raised [Below]).

POINT III
THE COURT'S FAILURE TO CHARGE THE JURY ON THE LESSER INCLUDED OFFENSE OF CRIMINAL TRESPASS WAS PLAIN ERROR.  (Not Raised Below).

A.     The Court Was Required to Charge the Jury on Criminal Trespass Because It Was Clearly Indicated by the Record.

B.     Reversal on All Three Counts Is Required Because They Were Inherently Intertwined and Considered Together.

POINT IV
THE STATE'S FAILURE TO PRESENT COMPETENT EVIDENCE THAT THERE WAS OVER $2000 IN DAMAGE REQUIRES A JUDGMENT OF ACQUITTAL ON THE CRIMINAL-MISCHIEF CHARGE.

POINT V
RESENTENCING IS REQUIRED BECAUSE THE COURT FAILED TO ADDRESS SUPPORTED MITIGATING FACTORS AND MADE INAPPROPRIATE AGGRAVATING FACTOR FINDINGS; IMPOSED MULTIPLE EXTENDED-TERM SENTENCES; AND IMPOSED FINES ON A MERGED OFFENSE.

II.

As noted, defendant argues that the trial judge erred by allowing the State to admit certain testimony. He also argues that the prosecutor improperly provided opinion testimony.

We review the trial court's evidentiary rulings for abuse of discretion. State v. Green, 236 N.J. 71, 81 (2018) (citing State v. Rose, 206 N.J. 141, 157 (2011)). We will not set aside a trial court's evidentiary ruling "unless it appears that 'there has been a clear error of judgment.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting State v. J.A.C. 210 N.J. 281, 295 (2012)).

We note, however, that if there was no objection, we must determine if the judge erred by admitting the evidence, and if so, whether the error was "sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached." State v. Daniels, 182 N.J. 80, 95 (2004) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

A. Van Nieuwland and Barry's Identifications of Defendant.

Defendant argues, for the first time on appeal, that the trial judge erred by allowing Van Nieuwland and Barry to identify defendant as the person depicted in photos and videos that were shown to the jury. He contends the identifications were not admissible under Rule 701, which permits a lay witness to offer an

opinion when it (1) is "rationally based on the perception of a witness" and the opinion (2) will help the jury in its fact-finding function. N.J.R.E. 701.

The court may allow a lay witness to provide identification testimony if the witness has had "sufficient contact with the defendant to achieve a level of familiarity that renders the lay opinion helpful" or "the witness knew defendant over time and in a variety of circumstances." State v. Lazo, 209 N.J. 9, 22 (2012) (internal quotation marks omitted).

Here, defendant argues that Van Nieuwland and Barry did not have prior personal knowledge that he was the person depicted in the photos and videos. He also argues that the judge should not have permitted Van Nieuwland and Barry to identify him because "the jury was equally capable" of determining if he was the man shown in the photos and videos. We disagree.

Van Nieuwland testified that he knew defendant from prior interactions with him through his work as a police officer. Thus, Van Nieuwland was able to identify defendant based on his prior contacts and his familiarity with defendant. Barry also was familiar with defendant and had personal knowledge about the surveillance footage from GSC.

Thus, both witnesses were able to assist the jury perform its fact-finding function. The testimony was admissible under Rule 701.

Defendant argues, however, that he was prejudiced because the judge did not instruct the jury on identification. However, at trial, defendant's attorney conceded the instruction was not necessary.

The "invited error" principle precludes a defendant from asserting error on appeal after having urged the trial court to take the course the defendant now claims was erroneous. State v. Munafo, 222 N.J. 480, 487 (2015); State v. Kemp, 195 N.J. 136, 155 (2008). We therefore reject defendant's claim that the judge erred by failing to instruct the jury on identification.

B.  Van Nieuwland's Testimony About the Boot Prints.

Defendant argues that the judge erred by allowing Van Nieuwland to testify that the soles of the boots found in his possession were consistent with the boot prints found at the armory. He contends Van Nieuwland's testimony was not admissible because he was not qualified as an expert in boot prints. He also argues that the detective's testimony improperly invaded the jury's fact-finding role because the jury was capable of making its own comparison of the boot prints and the soles of the boots.

However, it is well-established that a person providing a footprint identification need not be qualified as an expert because "shoeprint patterns are often readily recognizable and well within the capabilities of a lay witness to

13

A-3216-17T4

observe. No detailed measurements, no subtle analysis or scientific determination is needed." State v. Johnson, 120 N.J. 263, 294 (1990).

Moreover, Van Nieuwland's testimony was permissible lay opinion under Rule 701. He compared the soles of the boots he recovered from defendant and the boot prints found in the armory. His testimony was based on his own perceptions and it assisted the jury in exercising its fact-finding role. N.J.R.E. 701. Therefore, the judge did not err by permitting Van Nieuwland to testify about the boot prints.

C. Prosecutor's Comments Regarding Eagle 20 Cigarettes.

Defendant argues that the judge erred by allowing the prosecutor to assert in his opening statement that Eagle 20 cigarettes are "unusual." As noted previously, a package of Eagle 20 cigarettes was found at the armory and in defendant's possession. The prosecutor stated that he had never heard of Eagle 20 cigarettes before.

Defendant contends that by making these statements, the prosecutor "testified" that Eagle 20 was an "unusual" brand of cigarettes. He contends the prosecutor's statements were not a fair comment on the evidence the State would present at trial. He claims he was prejudiced by the suggestion that the Eagle 20 cigarettes found in the armory belonged to him.

A prosecutor's comments will not warrant reversal on appeal unless they were "clearly and unmistakably improper" and "so egregious" that they denied defendant of the "right to have a jury fairly evaluate the merits of his defense." State v. Wakefield, 190 N.J. 397, 437-38 (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)). However, when counsel does not make a timely objection to the comments, "it is [ordinarily] a sign 'that defense counsel did not believe the remarks were prejudicial' when they were made." State v. Pressley, 232 N.J. 587, 594 (2018) (quoting State v. Echols, 199 N.J. 344, 360 (2009)).

Here, defendant's counsel did not object to the prosecutor's comments. Moreover, the prosecutor's lack of familiarity with Eagle 20 cigarettes had no bearing on any issue in the case. The prosecutor's comments were not clearly improper or egregious.

We are therefore convinced that the judge's failure to strike the comments sua sponte was not an error "clearly capable of producing an unjust result." R. 2:10-2.

D. Barry's Testimony About the Metals Sold to GSC.

At trial, Barry testified that certain metals defendant sold to GSC are typically used in "fins found in a large radiator[,]" and the insulation found at the armory "could have been" from the pipes defendant sold to the salvage yard.

Defendant moved for a mistrial and argued that Barry was not qualified to provide this testimony.

The trial judge denied defendant's motion, but ruled that Barry should not be permitted to testify that the pipes or materials sold to GSC came from the armory. Thereafter, the State did not elicit any testimony from Barry as to whether the pipes and materials shown in the photographs came from the armory.

McBride testified, however, that the armory, like other buildings the Department built around the same time, had "fin-tube radiators." He stated the materials in the photos from the salvage yard depicted parts of a "fin-tube radiator," a boiler backflow preventer, air conditioning coils from a large building, and pipes that could have been attached to the armory's boiler.

Defendant asserts Barry's and McBride's statements were expert testimony because an average juror would not be expected to know about the component parts of a heating system. He contends Barry and McBride should not have been allowed to provide this testimony because they were not qualified as experts. Again, we disagree.

The record shows that Barry had extensive experience working in the salvage yard, and McBride was familiar with the infrastructure of the

Department's buildings. Neither witness gave an opinion as to whether the pipes defendant sold to GSC came from the armory. Furthermore, both witnesses testified based on their personal experiences, and they did not "explain the implications" of facts "that would otherwise fall outside the understanding of ordinary people." McLean, 205 N.J. at 460.

III.

Defendant argues that the prosecutor made certain statements and presented testimony that suggested defendant is a bad person, who was prone to committing crimes at the expense of the public. He asserts that, individually and cumulatively, the statements and testimony deprived him of his right to due process and a fair trial.

A. Prosecutor's Opening Statement.

Defendant contends that the prosecutor tainted the proceedings by stating in his opening remarks that defendant "took advantage of an unoccupied taxpayer-owned building" and became "addicted to . . . easy cash." He contends these comments were likely to prejudice him because the jury later learned he was homeless.

In his opening, the prosecutor asserted that the State would prove defendant removed materials from the armory and sold them to the salvage yard

on seventeen separate occasions. The prosecutor commented that the State would show that defendant "took advantage" by removing materials from "an unoccupied taxpayer-owned building." The comment that defendant was "addicted to . . . easy cash" was a fair summary of the evidence the State intended to present at trial.

We note that even if the prosecutor erred by stating that defendant was "addicted to . . . easy cash," defense counsel did not object to the statement. Therefore, we may presume counsel did not view the comment as prejudicial. Pressley, 232 N.J. at 594 (citing Echols, 199 N.J. at 360). In any event, the comment was not "clearly and unmistakably improper" and did not deprive defendant of his right to a fair trial. Wakefield, 190 N.J. at 437-38 (citing Papasavvas, 163 N.J. at 625).

B. Officers' Testimony Regarding Defendant.

At trial, Van Nieuwland testified that he knew defendant "through police work" and D'Annibale stated he knew defendant from "prior dealings . . . through work." Defendant objected to these statements. The trial judge overruled the objection, noting that the officers could have come to know defendant as a victim, witness, or a person encountered on patrol.

On appeal, defendant argues that the officers' testimony constituted bad-acts evidence, which could only be admitted in accordance with Rule 404(b). N.J.R.E. 404(b). However, the officers' testimony did not trigger the requirements of Rule 404(b) because it was not evidence that defendant committed a "crime" or other "wrong."

The officers did not explain the circumstances under which they came to know defendant. Moreover, neither officer stated that defendant had a previous interaction with defendant in the context of some offense or bad act. The judge did not err by allowing this testimony.

C. Prosecutor's Comments in Summation.

Defendant contends the prosecutor inflamed the jury by making certain remarks in his closing argument. We note that in his opening statement, defense counsel stated:

> On a cold January day[,] a [forty-three-year-old] man was sworn in as the chief executive of his – of his country. By his side stood his predecessor, a famous general who [fifteen] years earlier had commanded his nation[']s armed forces in a war that resulted in the defeat of Germany. The young leader was raised in the Catholic faith. He spent the next five hours watching parades in his honor and stayed up celebrating till [three] o'clock in the morning. You know who I'm describing, right? It's January 1933, and I'm describing Adolph Hitler and not as some of you may have thought

or would have assumed John F. Kennedy.  The point is we all make assumptions. . . .

In his summation, the prosecutor responded to these comments.  The prosecutor stated in part:

> I don't think that it's fair – a fair analogy, but I can think we can extrapolate from Adolf Hitler and we can in his permanent office, if you will, and compare it or analogize it to what we have here. . . .
>
> We didn't know the level of a man's evil until the war, World War II was coming to a conclusion. . . .
>
> And . . . an investigation occurred and Hitler was found to be the man in charge, the man who ordered that and the man who was responsible for [deaths of] millions, millions of Jews.  It was the evidence [which] showed that Hitler was directly responsible for that just like the direct and circumstantial evidence that you heard from the witness stand show that [defendant] is guilty of the crimes charged in the indictment.

Suffice it to say, the comments regarding Adolf Hitler by defense counsel and the prosecutor were entirely inappropriate and had no place in this trial.  Certainly, defense counsel could have made his point about the need to avoid making assumptions without mentioning Hitler.  Similarly, the prosecutor could have responded to those remarks without mentioning Hitler and the deaths of millions of Jewish persons.

A-3216-17T4

Nevertheless, we are not convinced that the prosecutor's comments were intended to inflame the jury or deprived defendant of his right to a fair trial. The prosecutor's comments about Hitler had no bearing on any material issue in the case and could not reasonably have led the jury to a result it would not otherwise have reached based on the evidence presented at trial.

IV.

Defendant also argues that the judge erred by failing to charge the jury on a lesser-included offense, specifically criminal trespass under N.J.S.A. 2C:18-3(a). Defendant did not request this instruction. He argues, however, that the judge's failure to charge criminal trespass sua sponte constitutes plain error and requires reversal of all of his convictions.

When a party to a criminal proceeding does not request a charge on a lesser-included offense, the judge should only give the charge sua sponte if there is "obvious record support" for it. State v. Funderburg, 225 N.J. 66, 81 (2016). A trial judge should charge a lesser-included offense sua sponte "only where the facts in evidence 'clearly indicate' the appropriateness of that charge." Savage, 172 N.J. at 397 (internal citations omitted). A trial judge is not required to "scour the statutes to determine if there are some uncharged offenses of which

the defendant may be guilty. . . ." <u>State v. Brent</u>, 137 N.J. 107, 118 (1994) (quoting <u>State v. Sloane</u>, 111 N.J. 293, 302 (1988)).

Here, the judge did not err by failing to charge the jury sua sponte on criminal trespass because the evidence did not clearly indicate such an instruction was warranted. Defendant contends the State's case was entirely circumstantial and could have supported a finding that he entered the armory without permission but when he did so, he did not intend to commit a crime.

However, the State presented strong, if not overwhelming, evidence that defendant entered the armory on numerous occasions with the intent to take copper and other materials and sell them to the salvage yard. The evidence did not clearly indicate that when defendant entered the armory, he did not intend to commit a crime in the armory.

Defendant further argues that the judge erred by failing to give the jury a charge on multiple offenses. He asserts that the charges of theft and criminal mischief were inherently intertwined with the burglary charge. He contends the judge was required to specifically instruct the jury that it must consider all three charges separately. He asserts that without this instruction, the jury was likely to view all three offenses together. We do not agree.

Here, the trial judge instructed the jury that the State had to prove the elements of each offense beyond a reasonable doubt and the judge reviewed the elements of each charged offense. The judge also reviewed the verdict sheet, which required the jurors to make findings that defendant was guilty or not guilty of each separate offense. The judge's instructions were proper and a more specific charge on multiple offenses was not required.

V.

Defendant contends the State failed to present sufficient competent evidence showing that the armory sustained a pecuniary loss of $2000 or more as a result of his actions. He therefore contends the conviction for criminal mischief must be reversed.

A person is guilty of criminal mischief if he or she "purposely, knowingly, or recklessly tampers with tangible property of another so as to endanger person or property, including the damaging or destroying of a rental premises by a tenant in retaliation for institution of eviction proceedings." N.J.S.A. 2C:17-3(a). N.J.S.A. 2C:17-3(b)(1) provides that "criminal mischief is a crime of the third degree if the actor purposely or knowingly causes pecuniary loss of $2000 or more."

Defendant argues the State did not meet its burden of proving the requisite pecuniary loss because the State did not establish the market value of the property removed from the armory. He further argues that McBride was not qualified to offer an opinion as to the cost to repair the damage in the armory and his testimony regarding the cost of such repairs was a net opinion.

However, at trial, the State presented sufficient evidence to establish that defendant had caused damage to the armory that had a value of $2000 or more. Barry testified that the salvage yard paid defendant $1489.15 for the materials defendant sold to GSC. Barry explained that the value of each item was determined based on its market price.

In addition, the State presented evidence showing that when defendant removed the pipes and other materials, he damaged the asbestos insulation. McBride testified that the cost to clean up the asbestos debris would be "greater than $2000." McBride's testimony as to these costs was proper lay opinion testimony under Rule 701. N.J.R.E. 701. Moreover, because McBride's opinion was based on his experience as an asbestos program manager, it was not an improper net opinion.

## VI.

Defendant further argues that his sentence is excessive. He contends resentencing is required because the trial judge failed to address certain mitigating factors, did not make appropriate findings on the aggravating factors, erred by imposing multiple extended-term sentences, and erroneously imposed fines and penalties on a merged offense.

"An appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). In reviewing a sentence, the court must determine whether: "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were . . . 'based upon competent credible evidence in the record'; [and] (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (third alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

"An appellate court is bound to affirm a sentence, even if it would have arrived at a different result, as long as the trial court properly identifies and balances aggravating and mitigating factors that are supported by competent credible evidence in the record." State v. O'Donnell, 117 N.J. 210, 215 (1989) (citing State v. Jarbath, 114 N.J. 394, 400-01 (1989); Roth, 95 N.J. at 364-65).

Here, the judge found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk that defendant will commit another offense); six, N.J.S.A. 2C:44-1(a)(6) (extent of defendant's prior criminal record and the seriousness of the offenses for which he has been convicted); nine, N.J.S.A. 2C:44-1(a)(9) (need to deter defendant and others from violating the law); and eleven, N.J.S.A. 2C:44-1(a)(11) (imposition of fine penalty or order of restitution without a term of incarceration would be perceived as part of cost of doing business). The judge found no mitigating factors and determined the aggravating factors substantially outweighed the non-existing mitigating factors.

The judge granted the State's motion for imposition of an extended term pursuant to N.J.S.A. 2C:44-3(a), finding that defendant met the definition of a persistent offender. The judge sentenced defendant on Indictment No. 17-02-0068 to three, concurrent, seven-year extended terms of incarceration for burglary (count one), theft (count two), and criminal mischief (count three).

On Indictment No. 17-03-0090, the judge merged count three (possession of a weapon for an unlawful purpose) with count one (aggravated assault), and sentenced defendant to a three-year prison term on count one. The judge also imposed an eighteen-month prison term on count two (unlawful possession of a weapon). The judge ordered that the sentences be served consecutively to the

sentences imposed on Indictment No. 17-03-0090. In addition, the judge imposed various fines, penalties, and assessments on both indictments.

Defendant argues that the judge failed to address or find mitigating factors one, N.J.S.A. 2C:44-1(b)(1) (defendant's conduct neither caused nor threatened serious harm); and two, N.J.S.A. 2C:44-1(b)(2) (defendant did not contemplate that his conduct would cause or threaten serious harm). We cannot agree.

Here, the judge noted that defendant's actions were "rather brazen" and "continuous." The judge also noted that there was harm associated with defendant's conduct. The judge pointed out that defendant had stolen property from the armory and did so in a way that will require a government agency to pay to clean up the asbestos debris. The judge provided sufficient reasons for his determination that mitigating factors one and two do not apply.

Defendant also argues that the judge failed to explain the basis for his findings of aggravating factors three, six, and nine. Again, we disagree. At sentencing, the judge reviewed defendant's criminal record, which included prior convictions that made him eligible for an extended term. The judge noted that there was a need to deter defendant and others from violating the law, and that defendant's attitude indicated there was a risk he would commit another offense. The judge observed that defendant was a person who was "going to do

27

what he wants to do when he wants to do it." The judge provided sufficient reasons for his findings.

In addition, defendant contends the judge erred by finding aggravating factor eleven. Citing State v. Dalziel, 182 N.J. 494, 502 (2005), defendant contends this factor should only be considered if the court is considering a non-custodial sentence. He notes that he was eligible for an extended-term sentence, and he entered a plea to the second indictment under which the State would recommend a consecutive three-year prison term. He also notes that defense counsel did not seek a non-custodial sentence.

We agree that the judge erred by finding aggravating factor eleven. Here, the judge was not considering whether to impose a non-custodial sentence. However, we are not convinced that the error requires resentencing. As noted, the judge found three other aggravating factors and no mitigating factors. The judge's findings are more than sufficient to support the seven-year, extended-term sentence on Indictment No. 17-02-0068, and the three-year consecutive sentence on Indictment No. 17-03-0090.

Defendant also argues that the judge erred by imposing three extended-term sentences on the charges in Indictment No. 17-02-0068. We agree. N.J.S.A. 2C:44-5(a)(2) provides that when a defendant is sentenced on multiple

28

offenses in a single proceeding, the court may only impose one extended-term sentence. The State acknowledges that the trial court could only impose one extended-term sentence. We remand the matter for resentencing on Indictment No. 17-02-0068.

Defendant further agrees that the judge erred by assessing defendant fees totaling $125 on count three of Indictment No. 17-03-0090 because that count had been merged with count one for sentencing purposes. The State agrees.

Therefore, on remand, the judge should amend the JOC on Indictment No. 17-03-0090 and delete the $50 assessment for the Victim of Crimes Compensation Board and the $75 Safe Neighborhood Assessment imposed on count three.

Accordingly, we remand the matter to the trial court for resentencing on Indictment No. 17-02-0068, and entry of a corrected JOC on Indictment No. 17-03-0090, in accordance with this opinion. In all other aspects, the JOCs are affirmed.

Affirmed in part, and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

29